**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **LAURIE A. HARDTKE,** | § | |
| | § | |
| **Plaintiff,** | § | **CIVIL ACTION NO.** |
| **v.** | § | |
| | § | **SA-04-CA-1006 NN** |
| **THE HARTFORD,** | § | |
| **an Insurance Company,** | § | |
| | § | |
| **Defendant.** | § | |

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**(DOCKET ENTRY 43) AND DENYING PLAINTIFF'S MOTION TO STRIKE**
**SUMMARY JUDGMENT PROOF (DOCKET ENTRY 48)**

## I. Introduction

The matters before the Court are defendant's motion for summary judgment (Docket Entry 43) and plaintiff's motion to strike portions of defendant's summary judgment proof (Docket Entry 48). Defendant filed its motion for summary judgment on April 27, 2006.[1] On May 19, 2006, plaintiff filed a response in opposition to summary judgment and incorporated a motion to strike portions of defendant's summary judgment proof.[2] Defendant responded on June 1, 2006, with a reply brief in support of summary judgment and a response to plaintiff's motion to strike.[3] After considering plaintiff's motion to strike, defendant's response to the

---

[1] Docket Entry 43.

[2] Docket Entries 47, 48. On May 10, 2006, plaintiff filed an unopposed motion for an extension of time to respond to the motion for summary judgment. Docket Entry 44. The motion was granted by Order entered on May 12, 2006. Docket Entry 45. Plaintiff filed a second unopposed motion to extend time on May 17, 2006. Plaintiff's response and motion to strike are considered in this Order, and therefore, the second motion to extend time is moot.

[3] Docket Entries 49, 50.

motion to strike, defendant's motion for summary judgment, plaintiff's response, defendant's

reply, and the entirety of the record in this matter, plaintiff's motion to strike is **DENIED**, and

defendant's motion for summary judgment is **DENIED**.

I have jurisdiction to enter this Order pursuant to 28 U.S.C. § 636(c).  The parties have

consented to proceed before a magistrate judge for all matters in this case, including trial and

entry of judgment.[4]  After the parties consented, the case was assigned to me on March 3, 2006.[5]

## II. Jurisdiction

This Court has jurisdiction pursuant to 28 U.S.C. § 1331, the statute conferring federal

question jurisdiction, and 29 U.S.C. § 2617(a)(2) of the Family & Medical Leave Act ("FMLA")

29 U.S.C. § 2601 *et seq*.

## III. Issue Presented

Has plaintiff demonstrated genuine issues of material fact for trial
that defendant retaliated against her for exercising her right to
medical leave under the FMLA?

## IV. Undisputed Facts

On January 2, 2001, defendant hired plaintiff to work in the position of customer service

representative at the National Answering Service Center in San Antonio, Texas.  Plaintiff's

duties consisted of answering telephone calls from insurance customers concerning claims or

issues with their policies.[6]  Upon commencing employment with defendant, plaintiff received

---

[4] Docket Entries 16 and 33.

[5] Docket Entry 34.

[6] Docket Entry 43, Tab 1 at 35, Tab 2.

information about defendant's human resources policies and received a copy of "The Hartford Code of Corporate Conduct."[7]  Plaintiff worked as a customer service representative for approximately six months.[8]  Subsequently, she transferred to the Fast Track Department as a claims processor for first-party automobile claims where she worked for approximately four months before becoming a third-party claims processor under the supervision of Melissa Lapid ("Lapid").[9]

In the position of claims processor for third-party automobile claims, plaintiff investigated property damage claims made by third-parties against defendant's automobile insurance customers.  Her duties included (1) receiving notice of loss through the telephone intake system or by mail; (2) contacting the insured customer within twenty-four hours of receiving notice of a claim; (3) verifying the insurance policy was active at the time of the incident; (4) opening the claim and immediately setting up a reserve of funds to cover the claim (the reserve was adjusted as needed over the course of the investigation); (5) obtaining recorded statements from the insured and the third-party claimant; (6) requesting a copy of the police report if a police report was filed; (7) requesting an appraisal of the vehicles involved; and (8) communicating with repair shops, rental companies, and other service providers to obtain information.  Plaintiff would then analyze the information and make a liability determination of whether to deny the claim or make a settlement offer.[10]  Once plaintiff made the liability

---

[7] Docket Entry 43, Tab 1 at 33-34, Tab 3.

[8] Docket Entry 43, Tab 1 at 35.

[9] Docket Entry 43, Tab 1 at 36.

[10] Docket Entries 43, Tab 1 at 55-56, Tab 5; 47, Tab 1 at 58 .

determination, she would close out the reserve.[11]  At that point, the claim file would be considered closed and no longer an active claim that needed handling.[12]

On May 13, 2002, plaintiff was involved in an automobile accident that resulted in her missing one week of work.[13]  When plaintiff returned to work on May 21, 2002, Lapid sent an e-mail message advising plaintiff that she would not be assigned any new claims so that plaintiff could work her mail and bring her work manager current.  Lapid identified a list of tasks for plaintiff to accomplish by May 24, 2002.  The tasks included: work all of the mail on her desk, file all of the mail in labeled jackets inside her filing cabinet, file all jackets in the filing cabinet, bring her work manager current, and return calls before the end of her day.[14]  Lapid advised plaintiff that she needed to work the mail each day on the day it was received and file each piece of mail immediately after she worked it.[15]

Over the next month, Lapid worked with plaintiff to manage her work load.  On June 11, 2002, Lapid notified plaintiff that six hours of overtime had been approved, and Lapid wanted plaintiff to use the overtime hours to work all of the mail on plaintiff's desk.[16]  In a second e-mail message later the same day, Lapid counseled plaintiff and another employee on the importance of answering the "ACD" phone lines for the intake of claims.  All of the claims processors in the

---

[11] Docket Entry 47, Tab 1 at 58-59.

[12] Docket Entry 43, Tab 8 at 23-25.

[13] Docket Entry 43, Tab 1 at 72.

[14] Docket Entry 43, Tab 6, May 21, 2002 e-mail.

[15] **Id.**

[16] Docket Entry 43, Tab 6, June 11, 2002 e-mail.

Fast Track Department were expected to answer the "ACD" lines.[17]

Approximately two weeks later, plaintiff transferred from Lapid's team to Andrea Leal's ("Leal") team.  Leal spoke with plaintiff about putting too much detail into her claims investigations and not answering telephone calls "live."[18]  Leal also made sure that plaintiff and the other employees under her supervision worked the mail frequently.  Each week, Leal went to the work station of each employee under her supervision and told each employee to clean up the mail.[19]

On a Saturday in early August 2002, plaintiff suffered a seizure at a friend's ranch.  Her friends resuscitated her and took her inside the house to care for her.  Plaintiff did not immediately seek medical attention.  She returned to work on the following Monday.[20]  Plaintiff had difficulty functioning while at work.  She had trouble speaking and focusing her attention.  Her left side was weak.  She worked the entire week and went to the doctor on the following Monday.[21]  The doctor determined that plaintiff had suffered a small stroke.[22]

Plaintiff returned to work after her examination and informed Leal that the doctor did not want her to return to work.  Leal told plaintiff to go home and take care of herself.  She also told her to take the mail off of her desk and put it in the file cabinet so that her desk looked neat and

---

[17] Docket Entry 43, Tab 6, 2nd June 11, 2002 e-mail.

[18] Docket Entry 43, Tab 8 at 10-11.

[19] Docket Entry 43, Tab 1 at 123.

[20] Docket Entry 47, Tab 1 at 76.

[21] **Id.** at 77.

[22] **Id.** at 75.  The HartLeave Unit's intake summary identifies plaintiff's ailment as heat stroke.  Docket Entry 43, Tab 11.

clean. Leal explained that company "big wigs" were expected the next day.[23] On August 12, 2002, after spending a week off of work, plaintiff contacted defendant's HartLeave Unit. HartLeave handles all leave of absence requests for defendant. The HartLeave Unit forwarded FMLA paperwork to plaintiff. Plaintiff completed the paperwork, and the HartLeave Unit approved plaintiff for FMLA leave through October 28, 2002, noting that plaintiff planned to use five days of PTO leave.[24]

During plaintiff's absence from work, the employee assigned to cover plaintiff's share of work encountered difficulties locating files and documents. In the first week of September, over one hundred pieces of mail were discovered in plaintiff's file cabinet.[25] Some of the mail included documents received as early as mid-June 2002.[26] According to Leal, she determined that plaintiff had closed reserves on approximately twenty claims, even though the claims required additional investigation or handling.[27] While plaintiff admitted that prematurely closing reserves created an ethical issue and placed a defendant at risk, she denied prematurely closing reserves to fraudulently inflate her closing ratio or for any other improper purpose.[28]

On November 6, 2002, Leal drafted a memorandum with her concerns about plaintiff to Frank Carni ("Carni"), Director, and copied the memorandum to William Dextraze ("Dextraze"), Claim Manager, Royce Garcia, Assistant Claim Manager, and Betty Buck ("Buck"), Human

---

[23] Docket Entry 47, Tab 1 at 78.

[24] Docket Entry 43, Tab 12.

[25] Docket Entry 43, Tab 8 at 17-19.

[26] Docket Entry 43, Tab 13 at D-0074, D-0078-D-0085.

[27] Docket Entry 43, Tab  8 at 23-24, Tab 13 at D-0075.

[28] Docket Entry 43, Tab 1 at 127-128, Tab. 4 at 2.

Resources Manager.[29]  Carni met with Leal, Dextraze, and Buck to review Leal's memorandum.

Leal recommended that plaintiff be discharged.[30]  According to Carni, he independently reviewed

the information provided by Leal and consulted with Buck to ensure that any action would be

consistent with defendant's practices and policies. Carni made the decision to terminate

plaintiff's employment.[31]

On November 6, 2002, when plaintiff reported to work, Buck asked plaintiff to go to her

office and to meet with her and Carni.  At the meeting, Carni notified plaintiff that she was

discharged.[32]

During her time as a customer service representative and a first-party claims examiner,

plaintiff did not receive any discipline or counseling.[33]  While working under Lapid, plaintiff had

discussions with Lapid concerning claims and case load, but plaintiff was not "written up."[34]  In

March 2002, Lapid gave plaintiff a favorable performance review.[35]  Leal also discussed

performance issues with plaintiff, but did not formally "write up" plaintiff.[36]  Defendant did not

counsel plaintiff about the performance issues raised in Leal's memorandum, and instead

---

[29] Docket Entry 43, Tab 13.

[30] Docket Entry 43, Tab 14 at ¶ 2.

[31] **Id.** at ¶¶ 4-6.

[32] Docket Entry 43, Tab 14 at ¶ 6, Tab 15.  The parties dispute the particulars of the meeting.  Defendant alleged that Carni offered plaintiff a chance to explain the reasons for the deficiencies in the files and the premature closings, and plaintiff did not offer any explanations.  **Id.**  Plaintiff alleged that she asked to see the files, and Carni refused.  Docket Entry 47, Tab 1 at 88.

[33] Docket Entry 47, Tab 1 at 42.

[34] Docket Entry 47, Tab 1 at 42-44, Tab 2 at 13-16.

[35] Docket Entry 47, Tab 1 at 68-72.

[36] **Id.** at 10-11.

terminated plaintiff's employment immediately after she returned from FMLA leave.[37]

Plaintiff commenced the instant action pro se by submitting a complaint, which was filed on November 10, 2004.[38]  On October 19, 2005, counsel entered an appearance on behalf of plaintiff.[39]  On December 20, 2005, plaintiff filed a motion for leave to file an amended complaint, which was granted by Order entered on January 5, 2006.[40]  In her amended complaint, plaintiff claimed that defendant wrongfully terminated her employment in violation of the FMLA.[41]

## V. Analysis

### A. Summary judgment standard.

Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Rule 56 provides in pertinent part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.[42]

Rule 56 requires that there be no genuine issue of material fact.  A fact is material if it

---

[37] Docket Entry 47, Tab 4 at 2.

[38] Plaintiff filed a motion to proceed *in forma pauperis* on November 5, 2004.  Docket Entry 1.  The motion was granted by Order entered on November 10, 2004.  Docket Entry 2.  The Clerk then filed plaintiff's complaint on November 10, 2004.  Docket Entry 3.

[39] Docket Entry 17.

[40] Docket Entries 28, 30.

[41] Docket Entry 31.

[42] Fed. R. Civ. P. 56(c); **Celotex Corp. v. Catrett**, 477 U.S. 317, 322 (1986).

might affect the outcome of the lawsuit under the governing law.[43]  A dispute concerning a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.[44]  Therefore, summary judgment is proper if, under governing laws, there is only one reasonable conclusion as to the verdict; if reasonable finders of fact could resolve a factual issue in favor of either party, summary judgment should not be granted.[45]

The movant on a summary judgment motion bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record which it alleges demonstrate the absence of a genuine issue of material fact.[46]  To satisfy this burden, the movant must either submit evidentiary documents that negate the existence of some material element of the nonmoving party's claim or defense, or if the crucial issue is one for which the nonmoving party will bear the burden of proof at trial, merely point out that the evidentiary documents in the record contain insufficient proof concerning an essential element of the nonmoving party's claim or defense.[47]  Regardless of whether the movant accompanies its summary judgment motion with affidavits or other evidentiary materials, the motion must be granted if the evidence before the court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied.[48]  Once the movant has carried that burden, the burden then shifts to the party opposing the motion to present affirmative evidence in order to defeat a properly supported motion for

---

[43] **Anderson v. Liberty Lobby, Inc.**, 477 U.S. 242, 248 (1986); **Thomas v. LTV Corp.**, 39 F.3d 611, 616 (5th Cir. 1994).

[44] **Anderson**, 477 U.S. at 248; **Wise v. E.I. DuPont De Nemours & Co.**, 58 F.3d 193, 195 (5th Cir. 1995).

[45] **Anderson**, 477 U.S. at 249.

[46] **Celotex Corp.**, 477 U.S. at 323.

[47] **Edwards v. Aguillard**, 482 U.S. 578, 595 n.16 (1987) (citing **Celotex Corp.**, 477 U.S. at 323).

[48] **Celotex Corp.**, 477 U.S. at 323.

summary judgment.[49]

Importantly, the nonmoving party cannot discharge this burden by referring to the mere allegations or denials of the nonmoving party's pleadings.[50]  Rather, the nonmovant must, either by submitting opposing evidentiary documents or by referring to evidentiary documents already in the record, set out specific facts showing the existence of a genuine issue for trial.[51]  When determining whether a genuine issue of material fact exists, the court will not "weigh the evidence or evaluate the credibility of witnesses."[52]  The court will look at the record in the light most favorable to the nonmovant drawing all inferences most favorable to that party.[53]  Nevertheless, "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden."[54]  Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to his or her case on which he or she bears the burden of proof at trial.[55]  Accordingly, summary judgment motions permit the court to resolve lawsuits without the necessity of trials if there is no genuine dispute as

---

[49] **Anderson**, 477 U.S. at 257.

[50] Fed. R. Civ. P. 56(e); **Anderson**, 477 U.S. at 250; **State of Texas v. Thompson**, 70 F.3d 390, 393 (5th Cir. 1995).

[51] **Celotex Corp.**, 477 U.S. at 324; **Fields v. City of South Houston, Texas**, 922 F.2d 1183, 1187 (5th Cir. 1991); **Neff v. American Dairy Queen Corp.**, 58 F.3d 1063, 1065 (5th Cir. 1995).

[52] **Caboni v. General Motors Corp.**, 278 F.3d 448, 451 (5th Cir. 2002).

[53] **Hibernia Nat'l Bank v. Carner**, 997 F.2d 94, 97 (5th Cir. 1993).  **See also** **Little v. Liquid Air Corp.**, 37 F.3d 1069, 1075 (5th Cir. 1994) (holding that a nonmovant cannot discharge her burden with doubt as to the material facts, by conclusory allegations, unsubstantiated assertions, or by only a scintilla of evidence).

[54] **See** **Douglass v. United Services Auto. Ass'n**, 79 F.3d 1415, 1429 (5th Cir. 1996) (citing **Forsyth v. Barr**, 19 F.3d 1527, 1533 (5th Cir. 1994)).

[55] **Celotex Corp.**, 477 U.S. at 322-23.

to any material facts and the moving party is entitled to judgment as a matter of law.[56]

**B. Plaintiff's motion to strike.**

Relevant to the motion to strike, Rule 56(e) instructs:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits....

Under Rule 56(e) affidavits offered to support a summary judgment motion must meet three requirements.  The affidavit must be made on personal knowledge, must set forth facts that would be admissible in evidence, and affirmatively show that the affiant is competent to testify to the matters stated in the affidavit.[57]  If the affidavit fails to meet any of these requirements, a motion to strike that sets forth specific objections is the proper method for the opposing party to challenge the affidavit.[58]  An opposing party may also move to strike an affidavit supporting a motion for summary judgment that contains conclusory statements or statements that constitute hearsay.[59]  If only portions of the affidavit are objectionable, the court should disregard the inadmissable portions and consider the remaining parts of the affidavit in determining the motion

---

[56] **Fields**, 922 F.2d at 1187.

[57] **Casas Office Machines, Inc. v. Mita Copystar America, Inc.**, 42 F.3d 668, 682 (1st Cir. 1984).

[58] **Rushing v. Kansas City Southern Ry. Co.**, 185 F.3d 496, 506 (5th Cir. 1999), superceded by statute on other grounds as noted in **Mathis v. Exxon Corp.**, 302 F.3d 448, 459 n. 16 (5th Cir. 2002).

[59] **Spector v. Experian Information Services Inc.**, 321 F.Supp.2d 348, 352 (D.Conn. 2004).

for summary judgment.[60]  A court has broad discretion to grant or deny a motion to strike.[61]

In this case, plaintiff generally objects to statements contained in Carni's affidavit.  She objects to Carni's assertion that he concluded that plaintiff engaged in ethical violations and that plaintiff's actions could have led to fines by the Texas Department of Insurance.  She also objects to Carni's assertion that he believed that plaintiff intentionally engaged in the improper actions.[62]

Plaintiff did not specifically cite any authority for the proposition that a statement made in an affidavit must be supported by documents.  Furthermore, Carni is qualified to give testimony about how and why he reached his decisions.  The fact that he did not provide supporting documents does not detract from the admissibility of his explanation.  Finally, Carni is a supervisor in a company engaged in the insurance industry.  Based on his experience, he is qualified to express his concern that plaintiff's actions could have resulted in fines.  Carni's entire affidavit will be considered and given the appropriate weight.

Accordingly, plaintiff's motion to strike portions of Carni's summary judgment affidavit is **DENIED.**

**C. Has plaintiff demonstrated genuine issues of material fact for trial that defendant retaliated against her for exercising her right to medical leave under the FMLA?**

**1. FMLA burdens of production.**

Congress enacted the FMLA, in part, to "entitle employees to take reasonable leave for

---

[60] **Lee v. National Life Assurance Co. of Canada**, 632 F.2d 524, 529  (5th Cir. 1980).

[61] **Canady v. Erbe Elektromedizin GmbH**, 384 F.Supp.2d 176, 180 (D.D.C. 2005).

[62] Plaintiff did not reproduce the actual language from Carni's affidavit, but defendant has accurately identified the passages in its response.  Docket Entry 50.

medical reasons...."[63]  The statute provides an eligible employee with up to twelve work weeks of

leave in a twelve-month period if the employee has a serious health condition that prevents the

employee from performing the duties of the employee's position.[64]  Upon return from FMLA

leave, the employer is required to restore the employee to his or her previous position or an

equivalent position with equal pay and benefits.  The taking of leave cannot result in a loss of

benefits that the employee accrued prior to the date that the leave commenced.[65]  These

provisions constitute the prescriptive or substantive FMLA rights, the violation of which invoke

the entitlement or interference theories under 29 U.S.C. § 2615(a)(1).[66]

      The FMLA also provides employee with proscriptive rights.

> The proscriptive FMLA rights include an employee's right not to
> be discriminated or retaliated against for having exercised the right
> to take FMLA leave.  Claims for violations of these rights are
> brought under § 2615(a)(2).  These proscriptive FMLA provisions
> create a cause of action analogous to the actions for discrimination
> and for retaliation that are found in Title VII and the other
> discrimination statutes.[67]

      In this case, defendant terminated plaintiff's employment upon her return from leave.

Plaintiff claims that defendant violated her proscriptive FMLA rights by retaliating against her

for taking FMLA leave.[68]

      The Fifth Circuit typically applies the **McDonnell Douglas** framework to analyze

---

[63] 29 U.S.C. § 2601(b)(2).

[64] 29 U.S.C. § 2612(a)(1)(D).

[65] 29 U.S.C. § 2614(a)(1), (2), and (b).

[66] **Haley v. Alliance Compressor LLC**, 391 F.3d 644, 649 (5th Cir. 2004).

[67] **Id.** (internal citation omitted).

[68] **See** Docket Entry 47 at 1.  "This is a one-issue case for retaliation under the Family and Medical Leave
Act...."

retaliation claims under the FMLA where there is no direct evidence of discriminatory intent.[69]

Under the framework, the employee alleging the discrimination or retaliation bears the initial

burden of proving a *prima facie* case based on an adverse employment action.  If he or she does

so, the burden then shifts to the employer to establish a legitimate reason for the adverse

employment action.  When the employer proves a lawful, nondiscriminatory or nonretaliatory

reason for the adverse employment action, the burden then shifts back to the plaintiff-employee

to submit evidence that would permit a reasonable trier of fact to find that the alleged

nondiscriminatory or nonretaliatory reason was mere pretext for discriminatory or retaliatory

conduct.[70]

However, the **McDonnell Douglas** framework does not always work well in retaliatory

discharge cases brought under the FMLA where the employee concedes that discrimination was

not the sole motivation behind his or her discharge.[71]  In cases where the employee argues that

discrimination was one of the motivating factors, the mixed-motive framework applies.

> Within the mixed motive framework (1) the employee must make a *prima facie* case of discrimination; (2) the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action; and (3) the employee must offer sufficient evidence to create a genuine issue of fact either that (a) the employer's proffered reason is a pretext for discrimination, or-and herein lies the modifying distinction- (b) that the employer's reason, although true, is but one of the reasons for its conduct, another of which was discrimination.[72]

---

[69] **Hunt v. Rapides Healthcare Sys., LLC**, 277 F.3d 757, 768 (5th Cir. 2001) (quoting **Chaffin v. John H. Carter Co., Inc.**, 179 F.3d 316, 319 (5th Cir.1999)).

[70] **McDonnell Douglas Corp. v. Green**, 411 U.S. 792 (1973); **Reeves v. Sanderson Plumbing Products, Inc.**, 530 U.S. 133 (2000).

[71] **Richardson v. Monitronics Int'l**, 434 F.3d 327, 333 (5th Cir. 2005).

[72] **Id.**

If the employee is successful in showing that discrimination was a motivating factor in the adverse employment decision, the burden shifts to the employer to show that it would have taken the same employment action regardless of the discriminatory animus.  Essentially, the employer's final burden is the same as proving an affirmative defense.[73]

A *prima facie* case of retaliation under the FMLA requires the plaintiff to show: (1) he or she was protected under the FMLA; (2) he or she suffered an adverse employment action; and (3) he or she was treated less favorably than an employee who had not requested leave under the FMLA, or the adverse employment action occurred because he or she took leave under the FMLA.[74]  The plaintiff must show a causal relation between the protected activity and the adverse employment action, but the protected activity does not need to be the sole reason for the adverse employment action in order to survive a motion for summary judgment.  The plaintiff only needs to show that the protected activity and the adverse employment action were not completely unrelated.[75]

**2. Plaintiff's *prima facie* case.**

In this case, plaintiff has established the elements of her *prima facie* case of retaliation. There is no dispute that plaintiff was an employee protected under the FMLA and that the termination of her employment by defendant constituted an adverse employment action. Furthermore, plaintiff has offered sufficient evidence to establish a causal connection between her exercising her right to FMLA leave and defendant's termination of her employment.

Defendant does not dispute that plaintiff is able to establish the first two elements of her

---

[73] **Id.**

[74] **Id.**

[75] **Mauder v. Metro. Transit Auth. of Harris County, Tex.**, 446 F.3d 574, 583 (5th Cir. 2006).

*prima facie* case, but disputes that plaintiff has shown adequate causal connection between her

FMLA leave and subsequent termination.  Defendant argues that plaintiff relies heavily on the

timing of her termination to support the causal connection and such reliance is misplaced because

timing alone is insufficient to establish the required nexus.

While defendant is correct that timing alone is not conclusive of the causal connection

determination, it is a factor to be considered.[76]  The Fifth Circuit stresses that "[w]hen evaluating

whether the adverse employment action was causally related to the FMLA protection, the court

shall consider the 'temporal proximity' between the FMLA leave, and the termination."[77]  A

temporal relationship between the employee's conduct and discharge is a "significant but not

always determinative factor."[78]

Plaintiff offered undisputed evidence that defendant terminated plaintiff's employment

immediately upon her return from FMLA leave.  When plaintiff returned to work on November

6, 2002, she reported to her supervisor, Leal, and inquired about any new processes that may

have been put in place during her absence.  Leal acknowledged her presence, but otherwise

ignored plaintiff's questions.  Buck arrived and ordered plaintiff to report to Buck's office where

Carni was waiting.[79]  Although the parties disagree about the subsequent conversation, there is no

dispute that Carni informed plaintiff that her employment was terminated at that time.  Plaintiff

---

[76] <u>See</u> **<u>Jarjoura v. Ericsson, Inc.</u>**, 266 F.Supp.2d 519, 531 (N.D.Tex. 2003) (timing alone is insufficient to support an inference of retaliation); **<u>Gee v. Principi</u>**, 289 F.3d 342, 347 n.3  (5th Cir. 2002) (explaining in a Title VII action that timing alone is not conclusive of determinations of retaliation).

[77] **<u>Mauder</u>**, 446 F.3d at 583.

[78] **<u>Lillie v. Woodlands Operating Co., L.P.</u>**, No. Civ.A. H-04-2248, 2005 WL 1606923, at * 2 (S.D. Tex. July 1, 2005).

[79] Docket Entry 47, Tab 1 at 88-89.

was not allowed to go to her desk to retrieve her personal items; instead the HR department inventoried and packed her belongings. [80]

A more significant temporal proximity is unimaginable.  Had defendant discharged plaintiff any sooner, it would have violated the FMLA's prescriptive provisions by failing to return plaintiff to her position upon her return from leave.[81]  Instead, defendant reinstated plaintiff to her former position and then immediately discharged her without even giving her the opportunity to report to her work station.

In addition to the temporal proximity of her discharge to her FMLA leave, plaintiff offered additional evidence to support the causal connection component of her *prima facie* case. Significantly, prior to her discharge, plaintiff had never received a written reprimand or other disciplinary action while working for defendant.[82]  She had conversations with her supervisors about managing her work flow and addressing specific areas for improvement, especially working the mail.[83]  However, she was not warned that she needed to improve, or face disciplinary action.  In fact, plaintiff received a favorable performance review from Lapid in March 2002, shortly before her transfer to Leal's team.[84]

Defendant has a progressive disciplinary policy.[85]  Under the policy, an employee first receives a verbal counseling, then a written warning.  Following the written warning, an

---

[80] Docket Entry 47, Tab 1 at 89; Docket Entry 43, Tab 15.

[81] 29 U.S.C. § 2614(a)(1)(A) and (B).

[82] Docket Entry 43, Tab 1 at 43.

[83] **See** Docket Entry 43, Tab 6.

[84] Docket Entry 43, Tab 1 at 68, 71-72.

[85] Docket Entry 47, Tab 7 at 18.

employee is put on probation, and after probation is subject to termination.[86]  Clearly, defendant did not follow the progressive discipline procedure when it discharged plaintiff immediately upon her return from FMLA leave.  A reasonable trier of fact could conclude that defendant's failure to follow its own discipline procedures was motivated by plaintiff's exercise of her right to FMLA leave.

Furthermore, plaintiff testified in her deposition that she overheard certain members of management, Robert Shaughnessy, Mike Albright, and Pat Unhock, express dissatisfaction over the number of employees taking short term disability and FMLA leave and complaining that the employees were "milking" the system. According to plaintiff, management discussed the problem in a meeting and decided that management needed to make a statement.[87]  While none of these management personnel directly supervised plaintiff at the time of her dismissal or had input to the decision to terminate her employment, a reasonable trier of fact could infer that defendant's management was hostile towards employees exercising leave rights and this animus was a factor in plaintiff's dismissal.

Based on the foregoing evidence, plaintiff has established her *prima facie* case of retaliation, and therefore, the burden shifts to defendant to articulate a legitimate, nonretaliatory reason for its adverse employment action.

**3. Defendant's legitimate reason for discharge.**

Defendant contends that it discharged plaintiff for egregious ethical violations. According to defendant, during plaintiff's absence, Leal discovered numerous deficiencies in

---

[86] **Id.**

[87] Docket Entry 43, Tab 1 at 141; Docket Entry 47, Tab 4 at 2.

plaintiff's work and files.  Leal documented the deficiencies in a memorandum that she sent to Carni and other management personnel.  Most damaging of her accusations was that plaintiff had prematurely closed approximately twenty claims, and thereby potentially subjected the company to additional liability and fines.  In his affidavit, Carni stated that he considered the memorandum that Leal authored and reviewed all the pertinent information.  He claims that he contacted Buck to ensure that he was following procedures and then decided to discharge plaintiff.[88]

Accordingly, defendant has articulated a legitimate, nonretaliatory reason for terminating plaintiff's employment.  The burden returns to plaintiff to offer sufficient evidence to create a genuine issue of fact that either defendant's stated reason was a pretext for discrimination or retaliation, or that the reason is only one of the reasons for defendant's conduct, another of which was discrimination or retaliation.

**4. Pretext analysis.**

Plaintiff has submitted sufficient evidence to allow a reasonable trier of fact to question the credibility of defendant's proffered reason for its termination of plaintiff's employment.  As noted above, defendant did not follow its established disciplinary procedure when it discharged plaintiff.  Plaintiff did not receive a formal verbal warning about her performance, and she did not receive a written warning prior to her discharge.  Plaintiff was never placed on probation, or given notice that her job was in jeopardy.

Defendant contends that plaintiff's actions were not performance related, but involved violations of company rules and policies that were so egregious as to merit immediate termination.  According to Carni, he discharged plaintiff because she "engaged in unethical

---

[88] Docket Entry 43, Tab 14 at ¶¶ 3 and 4.

violations of company policy by closing reserves prematurely, hiding her mail, not making necessary contacts with claimants, and overall giving the impression she had taken care of a particular claim when in fact she had not."[89]  Leal brought these actions to Carni's attention through her memorandum of investigation and findings.  Carni stated that he conducted an independent review of the information, contacted Buck to insure that he was following company policy and procedures, and then made his determination to discharge plaintiff.[90]

However, Leal's memorandum to Carni is dated November 6, 2002, the very day that plaintiff was discharged.[91]  While the record does not indicate at what time plaintiff reported to work on November 6, 2002, Carni states that he reviewed the November 6th memorandum and conducted an independent review of the numerous cases identified by Leal in the memorandum. Without seeking input from other management personnel or discussing the matter with anyone, Carni decided to discharge plaintiff.  Only Buck provided any input, and then only about the procedure for discharging plaintiff.

Moreover, plaintiff has offered evidence explaining actions that Leal labeled as ethical violations in her memorandum.  Specifically, plaintiff testified at her deposition that Leal was always concerned about the mail and the appearance of the desks of employees under her supervision.  Leal did not want the desks to have a cluttered appearance.  According to plaintiff, before she left on leave, Leal told her to clear the mail off from her desk and put the mail in the file cabinet.[92]  Plaintiff expressly denied hiding the mail, and also denied prematurely closing

---

[89] Docket Entry 43, Tab 14 at ¶ 4.

[90] **Id.**

[91] Docket Entry 47, Tab 13 at 1.

[92] Docket Entry 47, Tab 1 at 77-78.

reserves.[93]

A reasonable trier of fact could question the veracity of Carni's affidavit and decide to believe plaintiff's testimony.  The trier of fact could conclude that defendant decided to terminate plaintiff's employment well in advance of November 6, 2002, and that plaintiff's exercise of her right to leave under the FMLA was the sole or primary motivating factor in her discharge. Plaintiff's evidence creates a genuine issue of material fact as to whether defendant's articulated reason for discharging her is a mere pretext for retaliation.  The evidence also raises a question as to whether defendant would have made the same decision to discharge plaintiff regardless of discriminatory or retaliatory animus.  Accordingly, summary judgment is not appropriate.

A number of courts considering summary judgment motions in FMLA retaliation cases have granted judgment as a matter of law in favor of the employers.  However, these cases are readily distinguishable.  In **Jarjoura**, the plaintiff began operating a home business in competition with his employer while he was on leave.  The plaintiff used his employer's equipment and financial resources to subsidize his business and charged over $10,000.00 in personal expenses on the corporate credit card.[94]  The court found the evidence of plaintiff's abuse or misuse of the corporate credit card to be a clear violation of company policy, and even considering the temporal proximity of the adverse action to the plaintiff being on FMLA leave, the record as a whole conclusively revealed a nonretaliatory reason for the plaintiff's discharge.[95]

In **Ramroop**, the plaintiff received two written warnings and a verbal warning for

---

[93] Docket Entry 43, Tab 14 at 1-2.

[94] **Jarjoura**, 266 F.Supp.2d at 525.

[95] **Id.** at 531.

21

outbursts of anger directed at other employees.[96]   The plaintiff's supervisor cautioned plaintiff

that future incidents of aggressive behavior could lead to further discipline including

termination.[97]   On the day that plaintiff returned from FMLA leave, a co-worker reported that

plaintiff smashed a radio on the floor and threw it into a trash can several feet away.  Plaintiff

was suspended and ultimately discharged.[98]   In granting summary judgment, the court opined that

the temporal proximity of plaintiff's discharge was sufficient to meet the causal element of his

*prima facie* case, but could not additionally be a factor to rebut defendant's nonretaliatory reason

for discharging him.[99]   The court further determined that the plaintiff failed to provide any

additional evidence to support his FMLA claim.[100]

Similarly, in **Richardson**, the plaintiff received written and verbal warnings from her

supervisors prior to her discharge.  The defendant employer instituted a new attendance policy.

Under the policy, the defendant issued an oral warning after one "occurrence," a written warning

after two "occurrences," a final warning after three "occurrences," and four "occurrences" in a

180 day period constituted grounds for termination.[101]   The plaintiff received a written warning

prior to taking FMLA leave, and after returning from leave incurred her final infraction resulting

in discharge.[102]   On motion for summary judgment, the defendant provided evidence showing

---

[96] **Ramroop v. Cooper Cameron Corp.**, No. Civ.A. H-05-1681, 2006 WL 696653, at *2 (S.D. Tex. March 20, 2006).

[97] **Id.**

[98] **Id.** at *3.

[99] **Id.** at *4.

[100] **Id.** at *6.

[101] **Richardson**, 434 F.3d at 331.

[102] **Id.**

that plaintiff had a long history of tardiness and absenteeism. The court determined that defendant's evidence overcame the plaintiff's evidence of retaliatory motive.[103]

The plaintiff in **Mauder** also received repeated warnings regarding his tardiness after returning from breaks. His supervisor gave him both verbal and written warnings. He also received a performance appraisal noting that on several occasions during peak times the plaintiff was away from his duty station.[104]   Plaintiff was put on a one-month corrective action plan and ultimately dismissed from employment. In affirming the district court's grant of summary judgment, the Fifth Circuit held that the defendant had provided sufficient evidence to show that it had made the decision to terminate plaintiff's employment prior to his request for FMLA leave, and therefore, plaintiff had failed to show that his request for leave was a motivating factor in his termination.[105]

Each of these cases demonstrate that evidence of prior performance issues documented by verbal and written warnings weigh heavily in support of a finding that a defendant's reason for the adverse employment action was not motivated by retaliatory animus. Unlike the plaintiffs in the cases cited above, plaintiff did not have a history of discipline problems. Her supervisors never issued a written warning to plaintiff concerning her performance, and although her supervisors discussed various work and time management issues with plaintiff, there is no evidence that plaintiff received a verbal warning. Unlike **Richardson**, **Ramroop**, and **Mauder**, defendant never put plaintiff on notice that she was violating company policy and that her job

---

[103] **Id.** at 336.

[104] **Mauder**, 446 F.3d at 578.

[105] **Id.** at 583-84.

was in peril.  Likewise, none of plaintiff's alleged improper acts involved the knowing and intentional misuse of company resources as found in **Jarjoura**.

Significant factual differences distinguish the instant case from those referenced above. However, the cited cases all provide the same instruction.  When considering a motion for summary judgment in the context of an FMLA retaliation case, courts should consider the record as a whole in determining whether the employee carried his or her burden in establishing a *prima facie* and successfully rebutting the employer's articulated nonretaliatory reason for the adverse employment action.  The evidence should not be considered in a piecemeal fashion, but viewed in its totality.

The instant case is a close one.  However, the record as a whole supports the conclusion that plaintiff has successfully carried her burden in all instances to demonstrate that genuine material questions of fact exist for trial.  Trial on the merits is therefore warranted.  Accordingly, defendant's motion for summary judgment is **DENIED.**

### VI. Conclusion

Based on the foregoing analysis, I hereby **DENY** Laurie Hardtke's motion to strike and **DENY**  The Hartford's motion for summary judgment.  As discussed above, Laurie Hardtke has established a *prima facie* case of retaliation and has rebutted The Hartford's articulated nonretaliatory reason for terminating her employment.  Therefore, genuine issues of material fact remain for trial, and The Hartford is not entitled to judgment as a matter of law.

**SIGNED** on October 10, 2006.

*Nancy Stein Nowak*

NANCY STEIN NOWAK
UNITED STATES MAGISTRATE JUDGE